UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

WESLEY I. PURKEY,               )
                           )
     Plaintiff,             )
                           )
       v.             )     Cause No. 2:19-cv-00541-JMS-DLP
                           )
J.T. WATSON, *Complex Warden*,   )
TAYLOR, *Captain*,          )
                           )
     Defendants.         )

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR
FAILURE TO STATE A CLAIM OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT ON FAILURE TO EXHAUST DEFENSE**

Plaintiff Wesley I. Purkey is an inmate serving a death sentence within the Federal

Bureau of Prisons ("BOP") for kidnapping, raping, and murdering a sixteen-year-old girl.

Although his execution was previously scheduled for December 13, 2019, the U.S. District Court

for the District of Columbia stayed that execution pending resolution of a lawsuit challenging the

execution protocol.  This action concerns only Purkey's conditions of confinement while

awaiting his execution within the Special Confinement Unit ("SCU") at the United States

Penitentiary in Terre Haute ("USP Terre Haute").

Purkey alleges that, since his execution was scheduled in July of 2019, Defendants,

Complex Warden Thomas J. Watson and Captain Timothy Taylor, have instituted a policy in

which an officer checks on him every fifteen minutes, causing sleep deprivation and associated

symptoms.  [*See* Filing No. 2.]  He brings these claims against Defendants in their individual

capacities pursuant to the theory recognized in *Bivens v. Six Unknown Federal Narcotics Agents*,

403 U.S. 388 (1971).

As set forth below, Purkey's conditions-of-confinement claims present a new *Bivens* context, and "special factors" counsel against an expansion of *Bivens* here.   *See Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).  Accordingly, this entire action should be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Furthermore, given the current state of law regarding the viability of conditions-of-confinement claims under *Bivens*, Defendants are entitled to qualified immunity as to these claims, further justifying the dismissal of this action.

In the alternative, should the Court elect to expand the *Bivens* remedy to Purkey's claims here or determine that Defendants are not entitled to qualified immunity at this stage, this action must be dismissed due to Purkey's admitted failure to exhaust his administrative remedies before bringing these claims in federal court.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On October 28, 2019, Purkey filed a Civil Rights Complaint against the Attorney General of the United States, the Director of the BOP, Complex Warden Watson, and Captain Taylor. [*See* Filing No. 1 in *Purkey v. Barr*, Cause No. 2:19-cv-00517-JMS-DLP (S.D. Ind.).]  Upon screening, the Court construed the Complaint as raising two issues: (1) the basis upon which Purkey was selected for execution, and (2) the conditions of his confinement within the SCU at USP Terre Haute—namely, that an officer purportedly comes to his cell to check on him every fifteen minutes, including by shining a flashlight on him while he is sleeping, causing sleep deprivation.  [Filing No. 1 at 2.]  The Court then determined that these claims were misjoined and severed Purkey's conditions-of-confinement claims against Complex Warden Watson and Captain Taylor into this action.  [*See id.* at 3-5.]  Once this separate action was opened, the Court screened Purkey's conditions-of-confinement claims, allowing Eighth Amendment claims to proceed against Complex Warden Watson and Captain Taylor in their individual capacities under

a *Bivens* theory.  [Filing No. 6 at 2-3.]

In his Complaint, Purkey contends that, since execution dates were set for five death row inmates, including himself, on July 25, 2019, Complex Warden Watson and Captain Taylor have established a policy requiring that these inmates be accounted for, making sure they are "alive an [sic] breath[ing]," every fifteen minutes.  [Filing No. 2 at ¶ 29.]  He further alleges that he has complained to both Defendants about this policy.  [*Id.*]  According to Purkey, in response to his complaints, Complex Warden Watson advised Purkey that he did not have a problem with staff making sure the inmates scheduled for execution were awake and alive every fifteen minutes or so as long as they were not shaking the cell doors or making other noise and only waking them up with a flashlight.  [*Id.*]  Purkey contends that this policy has caused "acute sleep deprivation," anxiety, fatigue, chest pains, escalated heart rates, headaches, and disorientation.  [*Id.* at ¶ 31.]

## II.      STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

**A.      Wesley Purkey**

Purkey has been in BOP custody since February of 2002.   [Filing No. 24-1 (Declaration of Jenna Epplin ("Epplin Decl.")) at ¶ 4; *see* Filing No. 24-2 (Epplin Decl. Attachment 1) at 3.] For the majority of that time, Purkey has been housed within the SCU at USP Terre Haute, the high security component of the Federal Correctional Complex in Terre Haute ("FCC Terre Haute").  [Filing No. 24-1 (Epplin Decl.) at ¶ 4; *see generally* Filing No. 24-2 (Epplin Decl. Attachment 1) at 1-2.]

---

[1] Should the Court consider Defendants' alternative motion for summary judgment on their failure to exhaust defense, this section is included pursuant to S.D Ind. L. R. 56-1(a).

3

**B.      BOP's Administrative Remedy System**

The BOP has promulgated an administrative remedy system that appears at 28 C.F.R. §§ 542.10, *et seq*., and BOP Program Statement 1330.18, Administrative Remedy Program.[2] [Filing No. 24-1 (Epplin Decl.) at ¶ 5.]  This administrative remedy system was in effect at FCC Terre Haute during the entire time that Purkey was housed there.  [*Id.*]

All unrestricted BOP Program Statements are available for inmate access via their respective institution law library, including BOP Program Statement 1330.18, Administrative Remedy Program.  [*Id.*]  Additionally, administrative remedy filing procedures are outlined and explained to the inmates each time they arrive at a federal prison as part of the Admission and Orientation process.  [*Id.*]  Inmates are likewise instructed where to find BOP Policy, FCC Terre Haute Institution Supplements, and how to access the inmate Electronic Law Library.  [*Id.*] Finally, inmates are informed that if they have an issue or question for staff, they can ask in person or submit an Inmate Request to Staff by hard copy or electronically to a staff resource mailbox.  [*Id.*]

All administrative remedy requests submitted by inmates are logged and tracked in the SENTRY computer database, which is an electronic record keeping system utilized by the BOP. [*Id.* at ¶ 6.]  Administrative remedy requests filed at the institution level are referred to as BP-9s, and are identified in the SENTRY database by the notation "F1" following the remedy identification number.  [*Id.* at ¶ 8.]  Regional Office filings are referred to as BP-10s, and are identified by the notation "R1" following the remedy identification number.  [*Id.*]  Central Office (or General Counsel) filings are referred to as BP-11s, and are identified by the notation "A1"

---

[2] A full copy of BOP Program Statement 1330.18 is publicly available at http://www.bop.gov/policy/progstat/1330_018.pdf.

following the remedy identification number.  [*Id.*]  If amended or successive filings are submitted at the same level, the numeral following the alphabetical letter will change accordingly.  [*Id.*]  Rejected submissions are not considered "filed" and copies are not required to be maintained by the agency unless the submission was deemed "sensitive."  [*Id.*]

### C.      Purkey's Administrative Remedy History

A full report of Purkey's administrative remedy requests was run in SENTRY on February 18, 2020.  [*Id.* at ¶ 10; *see* Filing No. 24-4 (Epplin Decl. Attachment 3).]  As of that date, Purkey had submitted a total of approximately 560 administrative remedies.  [Filing No. 24-1 (Epplin Decl.) at ¶ 11; *see generally* Filing No. 24-4 (Epplin Decl. Attachment 3).]  He exhausted numerous of those remedy cases.  [*See* Filing No. 24-1 (Epplin Decl.) at ¶ 11; *see generally* Filing No. 24-4 (Epplin Decl. Attachment 3).]

### D.      Relevant Remedies Submitted *Before* Filing this Lawsuit

Between July 25, 2019—the date Purkey was scheduled for execution—and October 28, 2019—the date he filed his original lawsuit—Purkey has submitted approximately 11 administrative remedies.[3]  [*See* Filing No. 24-1 (Epplin Decl.) at ¶ 12; *see generally* Filing No. 24-4 (Epplin Decl. Attachment 4) at 2-8.]  In three of those remedies submitted during this period—Remedy Nos. 987526-F1, 991828-F1, and 991870-F1—Purkey complains about frequent rounds in the SCU that are purportedly causing him sleep deprivation.  [Filing No. 24-1 (Epplin Decl.) at ¶ 12; *see* Filing No. 24-6 (Epplin Decl. Attachment 5); Filing No. 24-10 (Epplin Decl. Attachment 9); Filing No. 24-11 (Epplin Decl. Attachment 10).]

---

[3] The SENTRY database notes that Remedy No. 989446-A1 was "voided to accept this appeal. See 989446-A2."  [Filing No. 24-1 (Epplin Decl.) at ¶ 12 n.2; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 3.]  This was likely an entry error.  Accordingly, this voided remedy is not included in this count.

Purkey filed Remedy No. 987256-F1 at the institutional level on August 14, 2019. [Filing No. 24-1 (Epplin Decl.) at ¶ 13; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 2; Filing No. 24-6 (Epplin Decl. Attachment 5) at 1-3.]  In it, Purkey complains that staff are making frequent rounds through the night and illuminating his cell with their flashlights, causing sleep deprivation.  [*See* Filing No. 24-6 (Epplin Decl. Attachment 5) at 1-3.]  Complex Warden Watson responded on November 18, 2019.  [Filing No. 24-1 (Epplin Decl.) at ¶ 13; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 2; Filing No. 24-6 (Epplin Decl. Attachment 5) at 4.] The Warden's response advises Purkey that, if he is dissatisfied with the response, he may appeal to the Regional Director within 20 calendar days of the date of the response.  [Filing No. 24-6 (Epplin Decl. Attachment 5) at 4.]  Purkey did not appeal this response to the Regional Director or attempt any more submissions related to this remedy case.  [Filing No. 24-1 (Epplin Decl.) at ¶ 13; *see generally* Filing No. 24-5 (Epplin Decl. Attachment 4).]

The following month, on September 18, 2019, Purkey submitted Remedy No. 991828-F1 at the institution level.  [Filing No. 24-1 (Epplin Decl.) at ¶ 14; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 5; Filing No. 24-10 (Epplin Decl. Attachment 9) at 1-6.]  In it, Purkey complains about purported sleep deprivation from frequent rounds in the SCU.  [*See* Filing No. 24-10 (Epplin Decl. Attachment 9) at 1-6.]  The remedy was rejected as repetitive to Remedy No. 987526-F1.  [Filing No. 24-1 (Epplin Decl.) at ¶ 14; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 5; Filing No. 24-10 (Epplin Decl. Attachment 9) at 6.]  Purkey appealed the rejection to the Regional Director on October 10, 2019.  [Filing No. 24-1 (Epplin Decl.) at ¶ 14; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 7; Filing No. 24-10 (Epplin Decl. Attachment 9) at 7-10.]  The Regional Director responded on December 20, 2019, stating that the "Warden adequately addressed [his] concerns regarding frequent and irregular rounds in Administrative

6

Remedy No. 987526" and noting that "[s]taff are required to view inmates in continuous lockdown to ensure their health and welfare."  [Filing No. 24-1 (Epplin Decl.) at ¶ 14; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 7; Filing No. 24-10 (Epplin Decl. Attachment 9) at 11.] The Regional Director's response further advises Purkey that, if he dissatisfied with the response, he may appeal to the Office of General Counsel within 30 days.  [Filing No. 24-10 (Epplin Decl. Attachment 9) at 11.]  Purkey did not appeal this response to the General Counsel or attempt any more submissions related to this remedy case.  [Filing No. 24-1 (Epplin Decl.) at ¶ 14; *see generally* Filing No. 24-5 (Epplin Decl. Attachment 4).]

On September 20, 2019, Purkey filed Remedy No. 991870-F1 at the institution level. [Filing No. 24-1 (Epplin Decl.) at ¶ 15; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 5; Filing No. 24-11 (Epplin Decl. Attachment 10) at 1-4.]  In this remedy, Purkey alleges, among other complaints, that officers' conversations, "social parties," and fifteen-minute rounds on the execution range were causing him sleep deprivation.  [*See* Filing No. 24-11 (Epplin Decl. Attachment 10) at 1-4.]  Complex Warden Watson responded to this remedy on November 8, 2019, again advising Purkey that, if he is dissatisfied with the response, he could appeal to the Regional Director within 20 calendar days.  [Filing No. 24-1 (Epplin Decl.) at ¶ 15; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 5; Filing No. 24-11 (Epplin Decl. Attachment 10) at 5.] Purkey did not appeal this response to the Regional Director or attempt any more submissions related to this remedy case.  [Filing No. 24-1 (Epplin Decl.) at ¶ 15; *see generally* Filing No. 24-5 (Epplin Decl. Attachment 4).]

**E.      Relevant Remedies Submitted *After* Filing this Lawsuit**

On November 20, 2019, Purkey filed Remedy No. 998039-F1 at the institution level. [Filing No. 24-1 (Epplin Decl.) at ¶ 16; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 9;

Filing No. 24-15 (Epplin Decl. Attachment 14) at 1-4.]  In it, Purkey again complains of sleep deprivation due to the purported policy of fifteen-minute rounds and states, "[t]his material exhaust [sic] this level of the applicable administrative procedures pursuant to 28 U.S.C. § 1997e."  [Filing No. 24-15 (Epplin Decl. Attachment 14) at 3.]  Complex Warden Watson denied this remedy on December 5, 2019, noting that it was repetitive of Remedy No. 987526-F1. [Filing No. 24-1 (Epplin Decl.) at ¶ 16; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 9; Filing No. 24-15 (Epplin Decl. Attachment 14) at 5.]

Purkey appealed the Warden's response to the Regional Director on December 17, 2019. [Filing No. 24-1 (Epplin Decl.) at ¶ 16; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 11; Filing No. 24-17 (Epplin Decl. Attachment 16) at 6.]  The Regional Director responded on January 30, 2020.  [Filing No. 24-1 (Epplin Decl.) at ¶ 16; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 11; Filing No. 24-17 (Epplin Decl. Attachment 16) at 7.]  As of February 18, 2020, Purkey had not attempted any more submissions related to this remedy case.  [Filing No. 24-1 (Epplin Decl.) at ¶ 16; *see generally* Filing No. 24-5 (Epplin Decl. Attachment 4).]

### III.   FAILURE TO STATE A CLAIM

Because Purkey's conditions-of-confinement claims arise in a new *Bivens* context, the Court must engage in a special factors analysis to decide whether it is appropriate to extend the *Bivens* remedy to these claims.  In light of recent case law and the special factors counseling against such an expansion, the Court should decline to so expand the *Bivens* remedy, justifying the dismissal of this entire action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Even if this Court disagrees, both Defendants are entitled to qualified immunity given the current in-flux nature of the law in this area.

**A.      Standard on a Rule 12(b)(6) motion.**

A party may bring a motion under Rule 12(b)(6) to dismiss a claim for which a plaintiff

is not entitled to relief.  *See* Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss under Rule

12(b)(6), the complaint "must actually suggest that the plaintiff has a right to relief, by providing

allegations that raise a right to relief above the speculative level."  *Arnett v. Webster*, 658 F.3d

742, 752 (7th Cir. 2011) (citation omitted).  In other words, a plaintiff's complaint must "provide

the 'grounds' of her 'entitle[ment] to relief'" based upon more than "labels and conclusions, and

a formulaic recitation of the elements of a cause of action."  *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 555 (2007).  Dismissal is proper "if the complaint fails to set forth 'enough facts to

state a claim to relief that is plausible on its face.'"  *St. John's United Church of Christ v. City of

Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) (quoting *Twombly,* 550 U.S. at 570).  In ruling on a

Rule 12(b)(6) motion to dismiss, the court accepts as true all of the well-pled facts alleged by the

plaintiff and all reasonable inferences that can be drawn therefrom.  *Barnes v. Briley*, 420 F.3d

673, 677 (7th Cir. 2005).

**B.      Purkey's conditions-of-confinement claims arise in a new *Bivens* context, and the Court should not extend the *Bivens* remedy to them.**

In *Abbasi*, 137 S. Ct. at 1857, the Supreme Court declined—once again—to extend

*Bivens* to a new category of constitutional claims, emphasizing that expanding the *Bivens* remedy

is now a "disfavored" judicial activity.[4]  After *Abbasi*, determining whether a *Bivens* remedy is

available essentially amounts to a two-step inquiry.  *Hernandez*, 2020 WL 889193, at *5.  First,

---

[4] The Court further noted that, "in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today."  *Abbasi*, 137 S. Ct. at 1856.  The Supreme Court reiterated its holding in *Abbasi* only three days ago, in *Hernandez v. Mesa*, __ S. Ct. __, 2020 WL 889193 (Feb. 25, 2020).

9

the court must determine whether the claim arises in a new *Bivens* context. *Id.*; *Abbasi*, 137 S. Ct. at 1864. If so, the second step asks whether there are "special factors counseling hesitation before authorizing a new kind of federal litigation." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (citation omitted); *accord Hernandez*, 2020 WL 889193, at *6; *Abbasi*, 137 S. Ct. at 1857. Furthermore, "when alternative methods or relief are available, a *Bivens* remedy usually is not." *Abbasi*, 137 S. Ct. at 1863 (citations omitted).

Courts should determine the availability of a *Bivens* remedy at the earliest possible stage in litigation. *Pereira Luna v. Thomas*, No. 2:19-cv-00431-JFW (AFM), 2020 WL 473133, at *6 (C.D. Cal. Jan. 28, 2020); *see Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017) (turning first to the question of whether a *Bivens* remedy existed as it is "antecedent" to the other questions presented and declining to resolve a Fourth Amendment issue when "in light of the intervening guidance provided in *Abbasi*, doing so may be unnecessary to resolve this particular case"). In evaluating whether to extend the *Bivens* remedy, "the most important question is who should decide whether to provide for a damages remedy, Congress or the courts. The correct answer most often will be Congress." *Hernandez*, 2020 WL 889193, at *12 (internal quotation marks and citations omitted).

Applying this inquiry, the Court should decline to extend *Bivens* to create Eighth Amendment conditions-of-confinement claims in the context presented here. As discussed below, the Supreme Court and courts around the country have refused to create a *Bivens* remedy when considering other conditions-of confinement claims.

**1.    A conditions-of-confinement claim is a new *Bivens* context.**

The first question a court must ask in determining whether a *Bivens* remedy is available is whether the claim arises in a new *Bivens* context—in other words, whether "the case is different

10

in a meaningful way from previous *Bivens* cases decided by [the Supreme Court]." *Abbasi*, 137

S. Ct. at 1859, 1864. "[D]ifferences that are meaningful enough to make a given context a new

one" may include, but are not limited to, "the rank of the officers involved; the constitutional

right at issue; the generality or specificity of the official action; the extent of judicial guidance as

to how an officer should respond to the problem or emergency to be confronted; the statutory or

other legal mandate under which the officer was operating; the risk of disruptive intrusion by the

Judiciary into the functioning of other branches; or the presence of potential special factors that

previous *Bivens* cases did not consider." *Id.* at 1860. Determining whether a case presents a new

*Bivens* context is not based on whether a particular circuit has recognized a *Bivens* remedy in a

specific context, but whether *the Supreme Court itself* has recognized a *Bivens* claim in that

context. *See Abbasi*, 137 S. Ct. at 1859 ("If the case is different in a meaningful way from

previous *Bivens* cases decided by *this Court*, then the context is new." (emphasis added)). If a

case presents a new *Bivens* context, then courts must consider whether "special factors counsel

hesitation" in recognizing a new *Bivens* claim. *See id.* at 1857.

The Supreme Court has recognized only three *Bivens* claims, including the claim in

*Bivens* itself: (1) a Fourth Amendment claim against federal agents who violated the prohibition

against unreasonable searches and seizures when they handcuffed a man in his own home

without a warrant, *Bivens*, 403 U.S. 388; (2) a Fifth Amendment claim against a Congressman

for firing his female administrative assistant, which was an alleged act of gender discrimination,

*Davis v. Passman*, 442 U.S. 228 (1979); and (3) an Eighth Amendment claim brought by an

inmate's estate against prison officials for failure to provide adequate medical care for his

asthma, purportedly resulting in his death, *Carlson v. Green*, 446 U.S. 14 (1980). *Abbasi*, 137 S.

Ct. at 1854-55, 1860. Moreover, in the last three decades, the Supreme Court has repeatedly

11

declined to create new implied damages remedies under *Bivens* in a number of contexts. *See*

*Abbasi*, 137 S. Ct. at 1857 (collecting cases); *accord Hernandez*, 2020 WL 889193, at *5.

Here, the only claims Purkey has been permitted to pursue in this action are Eighth

Amendment conditions-of-confinement claims against Complex Warden Watson and Captain

Taylor based on a purported policy that mandates fifteen-minute checks of the five death row

inmates with (previously) scheduled execution dates to ensure they are "alive and breathing."

Although the Supreme Court recognized the availability of a *Bivens* remedy for the purported

failure to provide adequate medical care under the Eighth Amendment in *Carlson*, 446 U.S. 14,

"[a] claim may rise in a new context even if it is based on the same constitutional provision as a

claim in a case in which a damages remedy was previously recognized." *Hernandez*, 2020 WL

889193, at *6; *see also Abbasi*, 137 S. Ct. at 1859 (suggesting that a case may present a new

context even when "the right and the mechanism of injury are the same").

Other than the fact that they are brought under the same constitutional amendment,

Purkey's claims against Defendants here bear little resemblance to the failure to treat a serious

medical condition at issue in *Carlson*. *See Hodges v. Matevousian*, No. 1:18-cv-00790-AWI-

EPG-PC, 2019 WL 5566055, at *5 (E.D. Cal. Oct. 29, 2019) (report and recommendation[5])

(determining that a claim of continuous lighting, purportedly causing sleep deprivation, arose in

a new *Bivens* context). *Carlson* involved an inmate with a chronic asthmatic condition who died

after he suffered an asthmatic attack.  446 U.S. at 16 n.1.  In the *Bivens* action against several

prison officials, his estate alleged several acts or omissions leading to his death, including

keeping him confined at the institution against the advice of doctors, failing to give him

---

[5] Both parties filed objections to this report and recommendation, and the district court has not yet issued an order on it.  [*See generally* Docket in *Hodges v. Matevousian*, 1:18-cv-00790-AWI-EPG (E.D. Cal.).]

competent medical attention for eight hours after the attack, administering contra-indicated drugs, attempting to use an inoperative respirator, and delaying his transfer to an outside hospital. *Id.* The Supreme Court recognized an implied Eighth Amendment damages claims for the "failure to provide medical treatment" that purportedly resulted in the inmate's death. *Abbasi*, 137 S. Ct. at 1859 (discussing *Carlson*'s holding). Here, Purkey's Eighth Amendment claims are not based on the failure to provide medical treatment and have not resulted in his death. As the Supreme Court recognized in *Abbasi*, 137 S. Ct. at 1864, "even a modest extension is still an extension."

*Abbasi* itself involved a challenge to detention policies, including continuous lighting, under the Fifth Amendment. *Id.* at 1853, 1858. The Supreme Court held that these confinement claims arose in a new *Bivens* context. *Id.* at 1860 (stating that conditions of confinement claims "bear little resemblance to the three *Bivens* claims the Court has approved in the past"); *see also Schwarz v. Meinberg*, 761 F. App'x 732, 734 (9th Cir. 2019) (unpublished), *cert. denied*, No. 19-5776, 2019 WL 5686563 (U.S. Nov. 4, 2019) ("Schwarz's Eighth Amendment claim regarding unsanitary cell conditions presents a new *Bivens* context because Schwarz does not allege a failure to treat a serious medical condition, which was the issue in *Carlson*, 446 U.S. at 16, 100 S.Ct. 1468. Rather, the basis of Schwarz's claim—a nonfunctioning toilet—resembles the conditions of the confinement claim the Supreme Court rejected in *Abbasi*."); *Hodges*, 2019 WL 5566055, at *5 ("[T]his Court has held that Eighth Amendment conditions of confinement claims present a new *Bivens* context because while arising under the cruel and unusual punishment clause, *Carlson* concerned inadequate medical care."). Therefore, conditions-of-confinement claims like Purkey's here present a new *Bivens* context, and the Court must conduct a "special factors" analysis before allowing the damages suit to proceed. *See Abbasi*, 137 S. Ct. at 1859-

13

60, 1864.

### 2.    There are alternative, existing processes precluding expansion of *Bivens*.

In determining whether to expand the *Bivens* remedy, courts must consider "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550.   As the Seventh Circuit has recognized, "[w]here Congress has established an alternative remedial structure to protect a constitutional right, the Supreme Court has strongly cautioned that the courts should not create a second remedy." *Goree v. Serio*, 735 F. App'x 894, 895 (7th Cir. 2018) (unpublished) (affirming district court's dismissal of inmate's due process claim because it was not cognizable under *Bivens* post-*Abbasi*).   In fact, where an alternative process exists, it "usually precludes a court from authorizing a *Bivens* action." *Abbasi*, 137 S. Ct. at 1865.   Here, there are alternative processes and relief available to Purkey that should preclude extending *Bivens* to his conditions-of-confinement claims.

First, in *Abbasi*, the Supreme Court recognized the availability of injunctive relief to address conditions-of-confinement claims. *Abbasi*, 137 S. Ct. at 1862.   The Supreme Court noted that unlike other contexts in which a *Bivens* remedy had been recognized:

> respondents do not challenge individual instances of discrimination or law enforcement overreach, which due to their very nature are difficult to address except by way of damages actions after the fact. Respondents instead challenge large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners.  To address those kinds of decisions, detainees may seek injunctive relief.

*Id.*   Similarly, here, Purkey's allegations regarding the policy of fifteen-minute checks relate to the conditions of confinement for the five death row inmates whose executions were previously scheduled, and not an individual instance of overreach targeted at only him.  Under these

14

circumstances, *Abbasi* counsels that injunctive relief against the appropriate officials *in their official capacities*, not a *Bivens* suit for money damages against officials personally, is the correct remedy. *Id.* at 1860 (noting that "a *Bivens* action is not 'a proper vehicle for altering an entity's policy'" (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)); *see also Malesko*, 534 U.S. at 71 (stating that *Bivens* "is concerned solely with deterring the unconstitutional acts of individual officers," and is not meant to "deter[ ] the conduct of a policymaking entity").

Furthermore, the BOP's administrative remedy procedure, whereby inmates can seek formal review of any complaint regarding any aspect of their imprisonment, is an alternative process that counsels against an expansion of *Bivens* to the case at hand. *See* 28 C.F.R. §§ 542.10-542.19. The administrative remedy program "provides yet another means through which allegedly unconstitutional actions and policies can be brought to the attention of the BOP and prevented from recurring." *Malesko*, 534 U.S. at 74. Regardless of whether Purkey invoked or received relief from this process,[6] that this alternative remedial structure is present counsels against inferring a *Bivens* cause of action in this new context. *See Abbasi*, 137 S. Ct. at 1863 (noting that when alternative methods of relief are available a *Bivens* remedy usually is not); *Malesko*, 534 U.S. at 72-74 (considering, in declining to extend *Bivens* to respondent's claims, that it was not "a situation in which claimants in respondent's shoes lack effective remedies"); *Goree*, 735 F. App'x at 895 (pointing out, in determining that it would be improper to recognize a new theory of *Bivens* relief, that the prisoner had administrative remedies through the BOP available to him); *Lovett v. Ruda*, No. 17-CV-02010-PAB-KLM, 2018 WL 4659111, at *9 (D.

---

[6] As indicated in their alternative motion for summary judgment below, Defendants contend that Purkey failed to exhaust his administrative remedies prior to filing this action. That does not, however, detract from the fact that the administrative remedy process was available to him.

15

Colo. Sept. 28, 2018), *appeal dismissed*, No. 18-1413, 2018 WL 8058575 (10th Cir. Dec. 11, 2018) ("The *Bivens* analysis appears to focus on the adequacy of remedies in the abstract rather than on a particular plaintiff's track record in pursuing relief.").

Moreover, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), in aggregate with other remedies, may provide another means through which inmates can bring claims regarding their conditions of confinement. [7]   Indeed, "[i]n our federal system, there is no question that States possess the traditional authority to provide tort remedies to their citizens as they see fit." *Wos v. E.M.A.*, 568 U.S. 627, 639 (2013) (internal quotation marks and citation omitted). In *Schwarz*, the Ninth Circuit found that an inmate's ability to bring his conditions-of-confinement claim under the FTCA demonstrated that he had alternative processes to pursue his claims. 761 F. App'x at 734-35; *see also Badley v. Granger*, No. 2:17-CV-00041-JMS-DLP, 2018 WL 3022653, at *3 (S.D. Ind. June 18, 2018) (refusing to create *Bivens* remedy in part because the inmate could have pursued an FTCA claim). While decades ago, the Supreme Court rejected the argument that the availability of an FTCA claim, standing alone, precluded a *Bivens* action, *Carlson*, 446 U.S. at 19, the Supreme Court's views have significantly evolved in the interim. *See Abbasi*, 137 S. Ct. at 1856 ("[I]n light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today."). It is now clear that state law remedies, aggregated with other alternative remedies, can also be probative to the special factors analysis. *See, e.g., Minneci v. Pollard*, 565 U.S. 118, 120 (2012) (declining to

---

[7] If an employee were acting outside of the scope of his or her employment, they can sue that individual directly. *See, e.g., Vanderklok v. United States*, 868 F.3d 189, 203-204 (3d Cir. 2017) (discussing the availability of a state law remedy against an individual when the offending employee acts outside the scope of employment).

16

recognize a *Bivens* remedy in part where "state tort law authorizes adequate alternative damages actions").

Finally, plaintiffs who seek declaratory and injunctive relief to change the BOP's policies or procedures may also have other avenues of judicial relief to protect their interests. Again, an alternative process need not offer monetary relief, "[s]o long as the plaintiff had an avenue for *some* redress." *Malesko*, 534 U.S. at 69 (emphasis added). The Administrative Procedure Act ("APA"), for example, provides for judicial review of a "final agency action." 5 U.S.C. § 704; *see also* 5 U.S.C. § 551(13) (defining "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"). Where appropriate, Purkey may challenge and seek declaratory or injunctive relief for BOP decisions that are not in accordance with the law under the APA. The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, also provides a potential avenue for redress, as it "validly confer[s] jurisdiction on federal courts to issue declaratory judgments in appropriate cases." *Calderon v. Ashmus*, 523 U.S. 740, 745 (1998); 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration.").

The bottom line is, whether it is by injunction, declaratory judgment, or some other means, Purkey has a number of non-damages avenues of equitable relief at his disposal. Defendants cannot and need not divine of all conceivable alternative avenues that Purkey may have available to raise his claims. *See Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 921 (D.C. Cir. 2018) (declining to imply disfavored *Bivens* remedy and noting courts need "not parse the specific applicability of th[e] web of . . . remedies" to a plaintiff's circumstances). Accordingly, because multiple processes and judicial remedies already exist to

vindicate Purkey's alleged infringement, the Court should not create a *Bivens* claim for damages against Defendants in their personal capacities here.

### 3.    Other special factors further counsel against a *Bivens* remedy for conditions-of-confinement claims.

Furthermore, there are other special factors counseling against the expansion of *Bivens* here.  In the context of conditions-of-confinement claims, fifteen years after the Supreme Court decided *Carlson*, Congress passed the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, which was intended to limit prison litigation that was overburdening the legal system. *See, e.g.*, *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002) ("Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits[.]"); 141 Cong. Rec. S7526 (Daily Ed. May 25, 1995) (statement of Senator Kyl) ("Statistics . . . show that inmate suits are clogging the courts and draining precious judicial resources.").  Provisions aimed at doing so include the total exhaustion of administrative remedies, *sua sponte* dismissal of meritless claims, and a bar on damages for mental or emotional injury absent a showing of physical injury or commission of a sexual act.  *See* 42 U.S.C. § 1997e(a), (c), & (e).  As the Supreme Court noted, "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." *Abbasi*, 137 S. Ct. at 1865.  The Supreme Court found that because Congress specifically considered prisoner claims and did not provide for a standalone damages remedy against individuals, "it suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Id.*; *see also* *Badley*, 2018 WL 3022653, at *4 ("Congress has been active in the area of prisoners' rights, and its actions—not creating new rights—do not support the creation of a new *Bivens* claim.").  Where established procedures exist for protecting prisoners' rights—as exist here—and Congress requires prisoners to follow those procedures, separation of powers weighs against the creation

18

of an implied remedy under *Bivens*.

Moreover, the Supreme Court has recognized the need to grant prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (internal quotation marks and citation omitted). Expanding the *Bivens* remedy to Purkey's condition-of-confinement claims raises the risk (in a way that recognizing the medical claims in *Carlson* did not) of establishing the federal courts as "virtually continuing monitors of the wisdom and soundness of" BOP policies regarding the frequency of rounds and ensuring the safety of death row inmates. *Cf. Laird v. Tatum*, 408 U.S. 1, 15 (1972). In light of the framework set up in *Abbasi*, and reiterated this week in *Hernandez*, it is improbable that "Congress would want the Judiciary to entertain a damages suit" against individual prison officials brought to litigate the validity and implementation of programmatic decisions and policies, *see Abbasi*, 137 S. Ct. at 1858, which are ingrained in the daily, ordinary workings of federal prisons and which Congress has expressly delegated to the "professional judgment of prison administrators," *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Additionally, in *Abbasi*, 137 S. Ct. at 1856, the Court identified a "number of economic and governmental concerns" that courts must consider before recognizing an implied cause of action. These include the substantial defense costs often created by claims against federal officials; Congress' "substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government;" and "the time and administrative costs attendant upon intrusions resulting from the discovery and trial process." *Id.* Thus, the determination of whether to recognize a

19

damages remedy "requires an assessment of its impact on governmental operations systemwide," one that considers "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies." *Id.* at 1858. In the context of *Bivens* specifically, the Court acknowledged that the imposition of *Bivens* liability may result in government officials, facing personal liability for damages, refraining from taking necessary and lawful action and reiterated that the costs and difficulties of later litigation may interfere with the discharge of their duties. *See id.* at 1863.

Here, extending the *Bivens* remedy to hold employees liable in their personal capacities for implementing policies in the prison in which they work (or other conditions about which an inmate might complain) would unduly burden governmental operations. There are, after all, approximately 146,293 inmates in BOP custody. [8] As the Supreme Court has noted, *Bivens* suits have never been "a proper vehicle for altering an entity's policy." *Malesko*, 534 U.S. at 74. Unlike instances of assault or deprivations of medical care, prison conditions, whether good or bad, are rarely the result of a single individual's actions, but are instead the result of policy and budgetary decisions implemented by a number of people. *See Abbasi*, 137 S. Ct. at 1862 (finding a *Bivens* remedy inappropriate where plaintiffs challenge "large-scale policy decisions concerning the conditions of confinement" and not "individual instances of discrimination or law enforcement overreach"). Therefore, the burden on government employees forced to defend in their individual capacities the policies and practices of their employer is an additional factor

---

[8] *See* https://www.bop.gov/about/statistics/statistics_inmate_shu.jsp (lasted visited February 28, 2020).

counseling hesitation. *See Silva v. Ward*, No. 16-CV-185-WMC, 2019 WL 4721052, at *8

(W.D. Wis. Sept. 26, 2019) (noting that creating a *Bivens* remedy for a conditions of

confinement claim would "divert substantial resources away from orderly prison

administration.").

> **4.    Courts nationwide have declined to create a *Bivens* remedy in the context of conditions-of-confinement claims.**

Finally, in addition to the Supreme Court in *Abbasi*, other courts around the country have

found that conditions-of-confinement claims arise in a new context and have declined to create a

*Bivens* remedy for these claims. *See, e.g.*, *Schwarz*, 761 F. App'x at 732 (non-functioning toilet);

*Hodges*, 2019 WL 5566055, at *4-6 (continuous lighting of cells); *Silva*, 2019 WL 4721052, at

*1-9 (unsanitary cell conditions); *Blackwell v. United States*, No. CV 15-08968 PA (AFM), 2019

WL 6619876, at *3-5 (C.D. Cal. Sept. 16, 2019) (cell ventilation); *Richardson v. United States*,

No. CIV-18-763-D, 2019 WL 4038223, at *7 (W.D. Okla. June 28, 2019), *report and*

*recommendation adopted*, No. CIV-18-763-D, 2019 WL 4017616 (W.D. Okla. Aug. 26, 2019)

(hazardous work assignment in kitchen); *Thomas v. Matevousian*, No. 1:17-cv-01592-AWI-

GSA-PC, 2019 WL 266323, at *1 (E.D. Cal. Jan. 18, 2019) (denial of supplies such as soap,

toothpaste, deodorant, razors, shampoo, writing paper, and envelopes); *Lovett*, 2018 WL

4659111, at *8 (failure to provide adequate food); *Mercer v. Matevousian*, No. 1:18-cv-00265-

DAD-BAM (PC), 2018 WL 3917969, at *1 (E.D. Cal. Aug. 14, 2018) (failure to provide

handicap shower); *Blank v. United States*, No. 4:17-CV-609-A, 2017 WL 5591633, at *4 (N.D.

Tex. Nov. 17, 2017) (pigeon infestation); *Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 63-66

(E.D.N.Y. 2017), *aff'd*, 755 F. App'x 67 (2d Cir. 2018) (denial of outdoor recreation, cleaning

supplies, dental hygiene supplies and being provided with dirty clothing, dirty razors, and shoes

without laces).

*Hodges* is particularly instructive.  In that case, an inmate brought an Eighth Amendment conditions-of-confinement claim challenging a change in policy to continuous, 24-hour lighting in his unit, which he contended caused sleep deprivation.  *Hodges*, 2019 WL 5566055, at *1. The court found that this claim arose in a new context and performed a special factors analysis. *Id.* at *4-5.  In finding that special factors counseled *against* extending the *Bivens* remedy to this conditions-of-confinement claim, not only did the court find that the existence of the PLRA itself was a factor counseling hesitation, but it also pointed out the alternative remedies available to the inmate (*i.e.*, the administrative remedy program and ability to seek injunctive relief), noting that an alternative remedy need not be perfectly congruent with *Bivens* or even perfectly comprehensive.  *Id.* at *5-6.  "So long as the plaintiff ha[s] an avenue for some redress, bedrock principles of separation of powers foreclose[ ] judicial imposition of a new substantive liability." *Id.* (quoting *Malesko*, 534 U.S. at 69).  Given the similarities of Purkey's conditions-of-confinement claims, the alternative remedies available to him, and the special factors present, this Court should also decline to extend the *Bivens* remedy to Purkey's conditions-of-confinement claims.

Based on the foregoing, the Court must dismiss Purkey's conditions-of-confinement *Bivens* claims against Defendants for failure to state a claim under Rule 12(b)(6).

## C.     Defendants are entitled to qualified immunity.

In the alternative, Defendants are entitled to qualified immunity as a matter of law. Under the doctrine of qualified immunity, government officials performing their discretionary functions are immune from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The aim of this doctrine is "to free officials from the

concerns of litigation, including avoidance of disruptive discovery." *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009).

Although qualified immunity is an affirmative defense, which is often inappropriate for dismissal on the pleadings, it is an issue at that "must be resolved at the earliest possible stage." *Ramsey v. Glaser*, No. 1:18-cv-01543-JMS-TAB, 2018 WL 4846299, at *4 (S.D. Ind. Oct. 5, 2018). Accordingly, under some circumstances, courts have determined that defendants are entitled to qualified immunity on a 12(b)(6) motion. *See, e.g.*, *Ewell v. Toney*, 853 F.3d 911, 918-20 (7th Cir. 2017); *Chasensky v. Walker*, 740 F.3d 1088, 1094-99 (7th Cir. 2014); *Vose v. Kliment*, 506 F.3d 565, 566, 572 (7th Cir. 2007); *Steidl v. Fermon*, 494 F.3d 623, 624, 633-34 (7th Cir. 2007); *Ramsey*, 2018 WL 4846299, at *4-7 (finding defendants were entitled to qualified immunity on a 12(b)(6) motion when plaintiff failed to plead facts that would support a conclusion that the seizure at issue was unreasonable). *But see, e.g.*, *John K. Maciver Inst. For Pub. Policy v. Schmitz*, 885 F.3d 1004, 1014 (7th Cir. 2018) ("Generally, affirmative defenses do not justify dismissal under Rule 12(b)(6).").

Once the defendant raises qualified immunity as a defense, the plaintiff has the burden of defeating it. *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). "To do so, the plaintiff must show (1) that the defendant violated a constitutional right, when construing the facts in the light most favorable to the plaintiff, and (2) that the right was clearly established at the time of the alleged violation, such that it would have been clear to a reasonable actor that her conduct was unlawful." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)); *accord Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). The plaintiff's failure to show either is fatal to his case. *Archer*, 870 F.3d at 613.

23

As to this first question, Purkey must have alleged sufficient facts in his Complaint demonstrating that, in (purportedly) establishing a policy of fifteen-minute checks of SCU inmates scheduled for execution, Complex Warden Watson and Captain Taylor violated his constitutional rights. But, accepting Purkey's allegations as true, this policy was implemented to ensure that those inmates, who, at the time, were facing an imminent execution date, were "alive and breathing." [Filing No. 2 at ¶ 29.] It is well settled that "[c]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations and quotations omitted). As pled in Purkey's complaint, Complex Warden Watson and Captain Taylor instituted this policy of fifteen-minute checks precisely to keep these inmates safe and minimize a risk of harm to them. This is the opposite of deliberate indifference.

Even if Purkey has alleged sufficient facts to suggest that Defendants violated his constitutional rights, given the current state of the law regarding *Bivens* suits, he cannot establish the second element—that the right was clearly established at the time of the alleged violation, such that it would have been clear to a reasonable actor that his conduct was unlawful. *Archer*, 870 F.3d at 613. The inquiry into whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts . . . not to define clearly established law at a high level of generality."). It is insufficient for a plaintiff simply to point to a recognized constitutional right and claim that the right has been violated. A plaintiff is required to show that a violation of the

24

right has been found in factually similar cases, or that the violation was so clear that an official would realize that he was violating an inmate's constitutional rights even in the absence of an on-point case. *See Ulichny v. Merton Comm. Sch. Dist.*, 249 F.3d 686, 706 (7th Cir. 2001) ("A right is not clearly established if officers of reasonably competence could disagree on the issue."); *see also City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate."). "This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Sheehan*, 135 S. Ct. at 1774.

As set forth in section B *supra*, the case law post-*Abbasi* supports the conclusion that Purkey cannot bring a *Bivens* suit for a conditions-of-confinement claim as presented here. Even if the Court disagrees with this analysis, and expands the *Bivens* remedy to Purkey's claims, the right would not have been clearly established as of July 2019, when the challenged policy was purportedly instituted, entitling Complex Warden Watson and Captain Taylor to qualified immunity and warranting the dismissal of this entire action under Rule 12(b)(6). *See, e.g.*, *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (concluding that, to be "clearly established," the law must be "clear in relation to the specific facts confronting the public official when he acted").

## IV.   FAILURE TO EXHAUST DEFENSE

Should the Court find that Purkey has stated a claim against Defendants and deny their motion to dismiss, Defendants move, in the alternative, for summary judgment on their failure to

exhaust defense.

### A.      Standard on a Rule 56 motion.

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper if the pleadings, depositions, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). When ruling on a motion for summary judgment, the court construes all justifiable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994).

It is not, however, enough for the party opposing a properly supported motion for summary judgment to rest on mere allegations or denials of his pleadings. *See Anderson*, 477 U.S. at 256. To overcome summary judgment, the non-movant must "respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "[T]he mere scintilla of evidence" and "[i]nferences supported only by speculation or conjecture" cannot defeat a motion for summary judgment. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (citations omitted).

### B.      Purkey has admittedly failed to exhaust his administrative remedies before initiating this action, requiring dismissal.

The PLRA requires inmates to fully exhaust their administrative remedies before bringing any suit involving prison conditions. *See* 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U. S. 81, 85 (2006); *Porter*, 534 U.S. 516; *Booth v. Churner*, 532 U.S. 731, 740-41 (2001); *Ford*

26

*v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004).  This statute makes exhaustion a condition precedent to suit in federal court.  *Burrell v. Powers*, 431 F.3d 282, 284 (7th Cir. 2005).  In *Booth*, 532 U.S. at 739, 741, the Supreme Court held that full exhaustion is mandatory, leaving the court with no discretion in this area, as "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures."

Exhaustion should be addressed early in the litigation because the PLRA "gives prisons and their officials a valuable entitlement—the right *not* to face a decision on the merits—which courts must respect if a defendant chooses to invoke it."  *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 536 (7th Cir. 1999).  Accordingly, when a defendant asserts exhaustion, "the judge must address the subject immediately" because the PLRA "can function properly only if the judge resolves disputes about [exhaustion] before turning to any other issue in the suit."  *Id.*; *see also Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008) ("The alternative of trying the merits before exhaustion . . . is unsatisfactory . . . because it would thwart Congress's effort to bar trials of prisoner cases in which the prisoner has failed to exhaust his administrative remedies.").

The Supreme Court has "identified the benefits of exhaustion to include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record."  *Jones v. Bock*, 549 U.S. 199, 219 (2007); *see also Cannon v. Washington*, 418 F.3d 714, 719 (7th Cir. 2005) (stating that the exhaustion requirement is "designed to alert prison officials to perceived problems and to enable them to take corrective action without first incurring the hassle and expense of litigation"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir. 2002) (noting that the exhaustion requirement "give[s] the prison administration an opportunity to fix the problem—or to reduce the damages

27

and perhaps shed light on factual disputes that may arise in litigation even if the prison's solution does not fully satisfy the prisoner").

Furthermore, "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532. To properly exhaust under the PLRA, an inmate must fully comply with the prison grievance procedures in effect at his place of confinement, *Jones*, 549 U.S. at 199, including filing "complaints and appeals in the place, and at the time, the prison's administrative rules require," *Pozo*, 286 F.3d at 1025.

The BOP has promulgated an administrative remedy system that appears at 28 C.F.R. §§ 542.10, *et seq*., and BOP Program Statement 1330.18, Administrative Remedy Program ("P.S. 1330.18"). [Filing No. 24-1 (Epplin Decl.) at ¶ 5.] The BOP administrative remedy process is a method by which an inmate may seek formal review of a complaint related to any aspect of his imprisonment. 28 C.F.R. § 542.10. The BOP regulations require that an inmate submit his grievance on an appropriate form and "place a single complaint or reasonable number of closely related issues on the form." 28 C.F.R. § 542.14; P.S. 1330.18 at 5.

To exhaust his remedies, an inmate must typically first file an informal remedy request through an appropriate institution staff member via a BP-8 prior to filing a formal administrative remedy request with the Warden. 28 C.F.R. § 542.13; P.S. 1330.18 at 4. Usually, if the inmate is not satisfied with the response to his informal remedy (BP-8), he is required to first address his complaint with the Warden via a BP-9.[9] 28 C.F.R. § 542.14; P.S. 1330.18 at 4. If the inmate is dissatisfied with the Warden's response, he may appeal to the Regional Director via a BP-10. 28

---

[9] There are exceptions to the requirement that the initial filing be made at the institution. *See* 28 C.F.R. § 542.14(d); P.S. 1330.18 at 6. None of these, however, are applicable here.

C.F.R. § 542.15; P.S. 1330.18 at 6-7.  Finally, if the inmate is dissatisfied with the Regional Director's response, then the inmate may appeal to the General Counsel via a BP-11.  28 C.F.R. § 542.15; P.S. 1330.18 at 7.  An inmate who has filed administrative remedies at all required levels and who has received a response to his appeal from the General Counsel is deemed to have exhausted his administrative remedies as to the specific issue, or issues, properly raised therein.  *See* 28 C.F.R. § 542.15 ("Appeal to the General Counsel is the final administrative appeal.").  Following exhaustion at all three administrative levels, the inmate may file a civil action in the proper United States District Court with respect to the issues properly addressed and exhausted at the administrative level.  42 U.S.C. § 1997e(a).

In his Complaint, Purkey effectively admits that he did not exhaust his administrative remedies, asking that exhaustion be excused because he (1) "faces irreparable harm from the delay incident to pursuing administrative remedies," (2) "there is substantial doubt as to whether defendants within the lower ranking Agency of the BOP are empowered to grant or render relief;" and (3) "defendants have indicated predetermination of given issues rendering exhaustion futile."  [Filing No. 2 at ¶ 8.]  Although these reasons appear related to Purkey's basis-for-selection claims, which are not a part of this action, they are nonetheless inconsequential.  This is because there is no futility exception to the exhaustion requirement under the PLRA.  *See, e.g.*, *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010) (stating that "there is no 'futility' exception to a prisoner's duty to exhaust" (citations omitted)); *Massey v. Wheeler*, 221 F.3d 1030, 1034 (7th Cir. 2000); *Perez*, 182 F.3d at 537 ("[T]here is no futility exception to § 1997e(a).").  Rather, the focus is on the availability, not the effectiveness, of administrative remedies.  *Massey v. Helman*, 196 F.3d 727, 733 (7th Cir. 1999).

29

Looking at the record evidence, Purkey cannot claim that the administrative remedy process was unavailable to him.  In fact, between 2004 and the present, Purkey has submitted approximately 560 administrative remedies, exhausting more than 40 of those.  [*See* Filing No. 24-1 (Epplin Decl.) at ¶ 11; *see generally* Filing No. 24-4 (Epplin Decl Attachment 3).]  Between July 25, 2019—the day Purkey's execution was scheduled (and the very earliest the fifteen-minute check policy could have been instituted)—and October 28, 2019—the day he first brought these claims in federal court—Purkey has submitted approximately 11 remedies.  [*See* Filing No. 24-1 (Epplin Decl.) at ¶ 12; *see generally* Filing No. 24-5 (Epplin Decl. Attachment 4) at 2-8.]  In three of those remedies— Remedy Nos. 987526-F1, 991828-F1, and 991870-F1— Purkey complains about frequent rounds purportedly causing him sleep deprivation.   [Filing No. 24-1 (Epplin Decl.) at ¶ 12; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 2, 5; Filing No. 24-6 (Epplin Decl. Attachment 5); Filing No. 24-10 (Epplin Decl. Attachment 9); Filing No. 24-11 (Epplin Decl. Attachment 10).]

Remedy Nos. 987526-F1 and 991870-F1 were accepted, and the Complex Warden responded to both of them.  [Filing No. 24-1 (Epplin Decl.) at ¶¶ 13, 15; *see* Filing No. 24-6 (Epplin Decl. Attachment 5); Filing No. 24-11 (Epplin Decl. Attachment 10).]  After the Warden responded, however, Purkey did not appeal those responses to the Regional Director, despite being advised as to the appeals process in the responses and having appealed to the Regional Director numerous times in the past.  [Filing No. 24-1 (Epplin Decl.) at ¶¶ 13, 16; *see* Filing No. 24-5 (Epplin Decl. Attachment 4) at 2, 5; Filing No. 24-6 (Epplin Decl. Attachment 5); Filing No. 24-11 (Epplin Decl. Attachment 10).]  Although Remedy No. 991828-F1 was rejected at the institution level as repetitive of Remedy No. 987526-F1, Purkey appealed to the Regional Director, who responded to his BP-10.  [Filing No. 24-1 (Epplin Decl.) at ¶ 14; *see* Filing No.

30

24-5 (Epplin Decl. Attachment 4) at 5, 7; Filing No. 24-10 (Epplin Decl. Attachment 9).]  The Regional Director also advised Purkey of how he could appeal to the BOP's Office of General Counsel.  [Filing No. 24-10 (Epplin Decl. Attachment 9) at 11.]  Purkey, however, failed to do so.  [Filing No. 24-1 (Epplin Decl.) at ¶ 14; *see generally* Filing No. 24-5 (Epplin Decl. Attachment 4).]  Under the BOP administrative remedy process, appealing to the Regional Director in Remedy Nos. 987256-F1 and 991870-F1 and appealing to the General Counsel in Remedy No. 991828-R1 were the next steps Purkey was required to take to exhaust his administrative remedies.  *See* 28 C.F.R. § 542.15; P.S. 1330.18 at 6-7.  His failure to do so renders these claims unexhausted.  *See Jones*, 549 U.S. at 199; *Pozo*, 286 F.3d at 1025 (requiring that inmates file "complaints and appeals in the place, and at the time, the prison's administrative rules require").

Purkey did file a fourth remedy—Remedy No. 998039-F1—alleging that he was experiencing sleep deprivation from frequent rounds in the SCU.  [*See* Filing No. 24-1 (Epplin Decl.) at ¶ 16; Filing No. 24-5 (Epplin Decl. Attachment 4) at 9; Filing No. 24-15 (Epplin Decl. Attachment 14) at 1-4.]  This remedy, however, was filed on November 20, 2019, over three weeks *after* he first brought these claims in federal court.  [*See* Filing No. 24-1 (Epplin Decl.) at ¶ 16.]  Significantly, in his BP-9, Purkey even acknowledges this pending action and his requirement to exhaust under the PLRA, stating that "[t]his material exhaust [sic] this level of the applicable administrative procedures pursuant to 28 U.S.C. § 1997e."  [Filing No. 24-15 (Epplin Decl. Attachment 14) at 3.]  Furthermore, although Purkey did appeal the Warden's response to this remedy to the Regional Director, this, again, occurred well *after* he had already initiated his original lawsuit.  [*See* Filing No. -1 (Epplin Decl.) at ¶ 16; Filing No. 24-5 (Epplin Decl. Attachment 4) at 11; Filing No. 24-17 (Epplin Decl. Attachment 16) at 6.]  The Regional

31

Director only recently responded to that BP-10 on January 30, 2020, and Purkey has not yet filed a BP-11 with, or received a response from, the General Counsel, as required to fully exhaust his administrative remedies.  [*See* Filing No. 24-1 (Epplin Decl.) at ¶ 16; Filing No. 24-17 (Epplin Decl. Attachment 16) at 6; *see generally* Filing No. 24-5 (Epplin Decl. Attachment 4).]

It is well settled that exhaustion is a precondition to filing suit and that a prisoner must fully exhaust his administrative remedies *before* filing suit and not during the course of the litigation.  *See, e.g.*, *Jones*, 549 U.S. at 202 (stating that the PLRA "requires prisoners to exhaust prison grievance procedures before filing suit"); *Ford*, 362 F.3d at 398 (noting that "Section 1997e(a) says that exhaustion must precede litigation" and that "'[no] action shall be brought until exhaustion has been completed"); *Dixon v. Page*, 291 F.3d 485, 489 (7th Cir. 2002); *Perez*, 182 F.3d at 536-37.  As the indisputable record evidence demonstrates, Purkey undoubtedly knows how to access, use, and successfully complete the administrative remedy process, debunking any claim that it was unavailable to him or he did not know how to successfully navigate the process.  *See Wagoner v. Lemmon*, 778 F.3d 586, 591 (7th Cir. 2015) (stating that the fact that the prisoner plaintiff "was able to exhaust two of his claims offers a reason to reject his claim that he was prevented from exhausting his other six").  His failure to do so as to the conditions-of-confinement claims he advances here should not—and cannot—be excused.

Consequently, Purkey's unexhausted conditions-of-confinement claims against Complex Warden Watson and Captain Taylor in this action must be dismissed due to his failure to exhaust these claims prior to filing this suit.  *See Jones*, 549 U.S. at 211 ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."); *Perez*, 182 F.3d at 535 ("[A] suit filed by a prisoner before administrative remedies

have been exhausted must be dismissed; the district court lacks discretion to resolve the claim on the merits, even if the prisoner exhausts intra-prison remedies before judgment.").

## V.    CONCLUSION

For the foregoing reasons, Defendants, Complex Warden Thomas J. Watson and Captain Timothy Taylor, in their individual capacities, by counsel, respectfully request that the Court grant their motion to dismiss, dismissing this action in its entirety.  In the alternative, Defendants respectfully request that this Court grant summary judgment in their favor and against Plaintiff Wesley I. Purkey and grant all other just and proper relief.

Respectfully Submitted,

JOSH J. MINKLER
United States Attorney

By:    *s/ Gina M. Shields*
Gina M. Shields
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2020, a copy of the foregoing *Brief in Support of Defendants' Motion to Dismiss for Failure to State a Claim or, in the Alternative, for Summary Judgment on Failure to Exhaust Defense* was filed electronically. Service of this filing will be made on the following ECF-registered counsel via electronic mail:[10]

John R. Maley
BARNES & THORNBURG, LLP
jmaley@btlaw.com

*s/ Gina M. Shields*
Gina M. Shields
Assistant United States Attorney

Office of the United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204

---

[10] Given the current uncertainty of Mr. Purkey's representation status in this matter [*see* Filing No. 20 at ¶ 9], and as to not run afoul of Indiana Rule of Professional Conduct 4.2 (and after consulting with Mr. Maley), undersigned counsel has not served a copy of this filing on Mr. Purkey directly, but only on Mr. Maley, via email.