UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| WESLEY I. PURKEY, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Cause No. 2:19-cv-00541-JMS-DLP |
| v. | ) | |
| | ) | |
| J.T. WATSON, *Complex Warden*, | ) | |
| TAYLOR, *Captain* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S BRIEF OPPOSING DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT ON THE FAILURE TO EXHAUST DEFENSE**

## I.      FACTS AND PROCEDURAL HISTORY

Mr. Wesley I. Purkey is an inmate serving in the Federal Bureau of Prisons ("BOP") at the United States Penitentiary in Terre Haute ("USP Terre Haute").  Mr. Purkey was originally scheduled to be executed on December 13, 2019, until he received a stay of execution from the U.S. District Court for the District of Columbia.  Mr. Purkey is now scheduled to be executed on July 15, 2020.[1]  This lawsuit concerns Mr. Purkey's confinement under conditions demonstrating deliberate indifference to his safety and serious medical needs in violation of the Eight Amendment.

Mr. Purkey filed suit on October 28, 2019.  [*See* filing No. 1; *Purkey v. Barr*, No. 2:19-cv-00517-JRS-DLP (S.D. Ind. Oct. 28, 2019).]  The complaint concerned two issues: (1) the basis upon which Mr. Purkey was selected for execution and (2) the conditions of his confinement.  [ECF1 at 2.]  The

---

[1] *See* Department of Justice, Justice News: https://www.justice.gov/opa/pr/executions-scheduled-four-federal-inmates-convicted-murdering-children#:~:text=On%20November%205%2C%202003%2C%20a,occur%20on%20July%2015%2C%202020.

Court severed the claims and determined that that they should proceed in a separate action. [*Id.* at 4.] Thereafter the Court screened the case and allowed this action to proceed with Eight Amendment claims against Defendants Watson and Taylor under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971)—due to Mr. Purkey's conditions of confinement. [ECF6 at 2-3.]

Mr. Purkey's execution date was set on July 25, 2019, and every day since, a guard visited his cell every fifteen minutes to check on him. [ECF2 at ¶ 29.] This includes shining a five-battery flashlight directly on his face, while he is sleeping. [ECF23-10 (Epplin Decl. Attachment 9) at 10.] As a result of the constant cell checks, Mr. Purkey is not able to sleep for more than fifteen minutes at a time. [ECF 2 at ¶ 31.] This has led to a wide range of symptoms including: sleep deprivation, anxiety, fatigue, chest pains, severe headaches, disorientation, and an elevated heart rate. [*Id.*] Consequently, one night Mr. Purkey had to push the emergency button in his cell because of the anxiety and stress caused by being constantly woken up by the fifteen-minute checks. [ECF24-6 (Epplin Decl. Attachment 5) at 3.] Mr. Purkey stated that "I pressed the emergency button in my cell after experiencing acute chest pains, shortness of breath and extreme headakes [sic]." [*Id.*]

Mr. Purkey addressed the matter with both Warden Watson and Captain Taylor. [ECF2 at ¶ 29.] The officials responded that they did not have a problem with the frequent checks, "as long as they are not shaking the cell door's [sic] or making noise of one sort or another." [*Id.*] The policy was adopted in order to make sure that the inmates were "alive an [sic] breath[ing]." [*Id.*] Despite the purpose of the policy—to determine if an inmate is alive and breathing—the frequent rounds and waking of Mr. Purkey continued, even when Mr. Purkey left his cell light on and the room had a camera in in the corner. [*Id.* at ¶¶ 29-30.]

Mr. Purkey has taken substantial steps before this suit to attempt to remedy the situation in addition to speaking with Warden Watson and Captain Taylor and leaving his cell light on at night. For example, he filed administrative remedies.

A.    **Administrative Remedy Process**

The BOP promulgated an administrative remedy system in 28 C.F.R. § 542 and BOP Program Statement 1330.18, Administrative Remedy Program.  [ECF 4-1 (Declaration of Jenna Epplin ("Epplin Decl.") at ¶ 5.]  This administrate remedy system was in effect the entire time Mr. Purkey was at FCC Terre Haute.  [*Id.*]

There are three levels of administrative remedies: (1) Institution, (2) Regional Office, and (3) Central Office.  First, an inmate may file a remedy request at the Institution level, which are called a BP-9s.  [*Id.* at ¶ 8.]  Next, Regional Office submissions are BP-10s.  [*Id.*]  Lastly, Central Office submissions are B-11s.  [*Id.*]

Mr. Purkey filed three actions, 987526-F1, 991828-F1, and 991870-F1, before this suit regarding his sleep deprivation.  [*Id.* at ¶ 12.]  First, 987526-F1 was filed August 14, 2019.  [*Id.* at ¶ 13.]  Mr. Purkey received a response on November 18, 2019, which he did not appeal.  [*Id.*]  However, the administrative response explained that "this matter will be thoroughly reviewed and if it is determined staff acted inappropriately, this issue will be forwarded to the proper investigate authority.  However, you will not receive information regarding the outcome of any staff investigation."  [Filing No. 24-6 (Epplin Decl. Attachment 5) at 4.]  Thus, the action was under investigation.  [*Id.*]

Second, 991828-F1 was filed on September 18, 2019, but was rejected as repetitive on September 24, 2019.  [ECF24-1 (Epplin Decl.) at ¶ 14.]  Mr. Purkey appealed this action on Oct. 10, 2019  [*Id.*]  Mr. Purkey received the response from the Regional Office on January 31, 2020, however the response was dated December 30, 2019, well after his initial scheduled execution date.  Then, Mr. Purkey filed his Central Office appeal on February 8, 2020, but it was not received by the Office until February 26, 2020.  Then, while the Central Office response was written on March 31, 2020, Mr. Purkey did not receive the Central Office response until April 30, 2020.  Lastly, 991870-F1 was filed on September 20, 2019.  [*Id.* at ¶ 15.]  The response was received by Mr. Purkey on November 8, 2019,

3

which explained that the matter "will be thoroughly reviewed and if it is determined staff acted inappropriately, this issue will be forwarded to the proper investigative authority." [ECF24-11 (Epplin Decl. Attachment 10) at 5.] Mr. Purkey did not appeal. [Filing No. 24-1 (Epplin Decl.) at ¶ 15.]

After Mr. Purkey filed suit, he filed his last administrative remedy, 998039-F1, on November 20, 2019. [*Id.* at ¶ 16.] The remedy was denied on December 5, 2019. [*Id.*] Mr. Purkey subsequently appealed the Warden's response to the Regional Office on December 17, 2019. [*Id.*] The Regional Office responded on January 30, 2020. [*Id.*] Yet, Mr. Purkey did not receive the Regional Office response until March 3, 2020. Mr. Purkey timely filed an appeal to the Central Office on March 9, 2020. The Central Office wrote the response on March 31, 2020, but the response was not received by Mr. Purkey until June 3, 2020.

## B.      The Pending Motion

Defendants filed a motion to dismiss for failure to state a claim or in the alternative, for summary judgment on the failure to exhaust defense. [ECF24] Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss and motion for summary judgment.

## II.      DISCUSSION

### A.      12(b)(6) Legal Standard

To survive a Rule 12(b)(6) motion, the complaint must provide enough factual information to state a claim for relief that is plausible on its face and "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must "accept as true" all of the "factual allegations contained in the complaint." *Twombly*, 550 U.S. at 572. However, courts are not bound to accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The purpose of a motion to dismiss is to "test the sufficiency of the complaint, not to decide the merits." *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989), *abrogated by Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668 (1996). Lastly, when ruling on a motion to dismiss, the court views the complaint in the light most favorable to the plaintiff. *See Iqbal*, 556 U.S. at 678; *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003).

**B.     *Bivens* Claim**

### 1.     The Court Should Deny Defendants' Motion To Dismiss Because Mr. Purkey's *Bivens* Claim Is Plausible On Its Face.

As the Court is aware, a *Bivens* claim is a judicially created remedy that "allows individuals to seek damages for unconstitutional conduct by federal officials." *Stanley v. Gonzales*, 476 F.3d 653, 657 n.1 (9th Cir. 2007). In *Bivens*, the Court held that a violation of the Fourth Amendment by a federal agent acting under color of his authority gave rise to a cause of action for damages consequent upon his unconstitutional conduct. 403 U.S. at 389. Thus, "it is . . . well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Id.* at 396 (internal citations omitted). The Supreme Court stated in *Wilkie* that "any freestanding damages remedy for a claimed constitutional violation has to represent a judgment about the best way to implement a constitutional guarantee; it is not an automatic entitlement no matter what other means there may be to vindicate a protected interest, and in most instances we have found a *Bivens* remedy unjustified." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). When deciding whether to recognize a *Bivens* claim, federal courts apply a two-step analysis.

First, if a case is different in a meaningful way from a previous *Bivens* case decided by the court, then the context is new. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1859 (2017). For example:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to

how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860.

Second, if the case is in a new *Bivens* context, the next determination is "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie,* 551 U.S. at 550. The court conducts a special factor analysis to take into account any "special factors counselling hesitation." *Chappell v. Wallace,* 462 U.S. 296, 298 (1983). Therefore, if the case does not present a new *Bivens* context, then the analysis stops at stage one. *See Abassi,* 137 S. Ct. at 1860.

Therefore, Mr. Purkey's potential claim only needs to be in the same context of an existing case recognizing a *Bivens* claim. In the alternative, if Mr. Purkey's claim is in a new context, special factors must not prevent extending *Bivens* to this context.

### 2.     Mr. Purkey's Confinement Under Conditions Demonstrating Deliberate Indifference To His Safety and Serious Medical Needs In Violation Of The Eight Amendment Is Not A New *Bivens* Context.

In a similar case to Mr. Purkey's, *Carlson v. Green,* 446 U.S. 14 (1980), the Court found that respondent pleaded a violation of the Eighth Amendment's proscription against infliction of cruel and unusual punishment, giving rise to a cause of action for damages under *Bivens.* The case, like the one before the Court today, was brought in the Southern District of Indiana alleging a breach of Eighth Amendment rights. *Id.* at 16. In *Carlson,* the petitioners knew about the seriousness of the prisoner's chronic asthmatic condition, but kept him in that facility against the advice of doctors and failed to give him competent medical attention. *Id.* at n.1. Here, Mr. Purkey was subjected to cell checks every fifteen minutes, which included shining a flashlight directly in Mr. Purkey's face throughout the night, while he was sleeping. [Filing No. 1 at 3; Filing No. 24-10 (Epplin Decl. Attachment 9) at 10.] Mr.

6

Purkey was not able to sleep more than fifteen minutes at a time. [Filing No. 1 at 3.] He experienced anxiety, fatigue, chest pains, severe headaches, disorientation, and an elevated heart rate as a result of the frequent, invasive cell checks. [*Id.*]

Importantly, and comparable to *Carlson* where petitioners knew of the medical condition but failed to give the prisoner attention, Defendants knew Mr. Purkey was suffering from a lack of sleep but continued the frequent cell checks. Mr. Purkey brought this to the attention of Warden Watson and Captain Taylor. [Filing No. 2 at ¶ 29.] Therefore, even though the Defendants knew Mr. Purkey was suffering from lack of sleep and even left his light on during the night to make these fifteen minute checks easier for guards, the guards continued to wake Mr. Purkey every fifteen minutes, causing harm. Moreover, in administrative remedy 987526-F1, Mr. Purkey stated "I pressed the emergency button in my cell after experiencing acute chest pains, shortness of breath and extreme headackes [sic]." [Filing No. 24-6 (Epplin Decl. Attachment 5) at 3.] Thus, both cases involve the Eighth Amendment and similar circumstances—failing to address a medical need—and should be considered in the same context.

Moreover, while *Abassi* stated that "even a modest extension is still an extension," the Court also noted that "[s]ome differences, of course, will be so trivial that they will not suffice to create a new *Bivens* context." *Abbasi*, 137 S. Ct. at 1864–65. When analyzing the prisoner abuse claim against the warden in *Abassi* for violating the Fifth Amendment and allowing prison guards to abuse respondents, the Court found that the situation had "significant parallels" to *Carlson*. *Id.* at 1864. However, the Court went on to say that there was a meaningful difference because (1) there was a constitutional right difference between the cases, (2) judicial precedents provided a less predictable guide, and (3) special factors were not considered in the *Carlson* case including alternative remedies. *Id.* The Court found these to be "meaningful" differences. *Id.* at 1865. By contrast, here, the same constitutional right is involved—the Eighth Amendment. Second, there is precedent finding that

"[t]here is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination.  This practice is unconstitutional."  *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) (quoting *LeMaire v. Maass*, 745 F. Supp. 623, 636 (D. Or. 1990), *vacated on other grounds*, 12 F.3d 144, 1458–59 (9th Cir. 1993)); *see also Grenning v. Miller-Stout*, 739 F.3d 1235, 1238 (9th Cir. 2014).  The only factor that is similar to *Abassi* is that there are alternative remedies.  Therefore, here, there is only one small difference between this case and *Carlson*, while there were three in *Abassi*.  As a result, there is not a meaningful difference and this is not a new *Bivens* context.

Further, while the Supreme Court noted in *Abassi* that it has only recognized three *Bivens* claims in the past, after that decision district courts shown a willingness to recognized *Bivens* claims based on allegations that prison staff were deliberately indifferent to their duty to protect prisoners from attack by other inmates.  *See Marquez v. United States*, No. 3:18-cv-0434-CAB-NLS, 2018 WL 1942418 (S.D. Cal. Apr. 25, 2018); *Lee v. Matevousian*, No. 1:18-cv-00169-GSA-PC, 2018 WL 5603593 (E.D. Cal. Oct. 26, 2018).

Another similar case recognizing a *Bivens* claim is *Farmer v. Brennan*, 511 U.S. 825 (1994).  There, the Supreme Court held that a prison official could be "held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Id.* at 847.  Recently, the *Farmer* case was used as support for denying a defendant's motion for judgment on the pleadings in the Eastern District of California.  *Garraway v. Cuifo*, No. 1:17-cv-00533-DAD-GSA (PC), 2020 WL 860028 (E.D. Cal. Feb. 21, 2020).  *Garraway* found that the case before the court did not differ in a meaningful way from *Farmer* and was not a new *Bivens* context.  *Id.* at *1.  Here, like *Farmer* and *Garraway*, Mr. Purkey's claim also involves deliberate indifference to his safety and serious medical needs in violation of the Eight Amendment.

8

Finally, and sadly, Mr. Purkey is not alone in suffering sleep deprivation tactics, which have been recognized as actionable by other federal courts. Back in 2006 in *Boulanger v. U.S. Bureau of Prisons*, 2006 WL 3694548 (D. N.H. Dec. 12, 2006), the court addressed an inmate's *Bivens* claims, including for sleep deprivation. Plaintiff there, like Mr. Purkey here, alleged sleep deprivation negatively impacting his health over many months, including with cell searches every two hours, 24 hours a day, and with lights. The court wrote:

> Boulanger alleges that the conditions in which he was held violated his constitutional right to humane conditions of confinement because the lights in his cell were left on twenty-four hours a day for a period of six months, and his cell was searched every two hours, twenty-four hours a day, for a period of one year, resulting in severe sleep deprivation and therefore a risk to his health. Some deprivations of comfort are to be expected during incarceration, even when the incarceration is intended to be nonpunitive pretrial confinement. However, where a particular condition persists to the point where it is punitive, and not a mere annoyance or discomfort, a pretrial inmate can state a claim upon which relief might be granted for a Fourteenth Amendment violation. *Id.* Boulanger has alleged that he was subjected to punitive conditions of confinement which persistently and severely deprived him of sleep. In an Order issued simultaneously with this Report and Recommendation, I will direct that this claim be served against the defendants to this action.

*Id.*

Similarly, in *Jorgensen v. Moore*, 2018 WL 3524607 (E.D. Cal. July 20, 2018), the court addressed *Bivens* where four correctional officers subjected an inmate to sleep deprivation through keeping a television at its highest volume during an inmate's entire stay at a hospital for three consecutive days. The court allowed the *Bivens* sleep deprivation claim to proceed through screening. 2018 WL 4191612 (E.D. Cal. August 31, 2018) (adopting Report and Recommendation).

Therefore, Mr. Purkey's claim does not present a new *Bivens* context, and thus should not be dismissed.

9

**3.      Assuming, *Arguendo*, That Mr. Purkey's Claim Is A New Context, Special Factors Do Not Counsel Against Extension In This Case.**

If the Court were to rule otherwise that Mr. Purkey's claim presents a new context, in step two of the analysis, the Court would look to see if there are "special factors" that counsel hesitation in extending *Bivens* remedy. *Abbasi*, 137 S. Ct. at 1857. The inquiry must concentrate on "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1858. Further, "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.*

Here, special factors do not counsel against extending a *Bivens* remedy. Moreover, other remedies such as an injunction and administrative remedies are not adequate in this case. While Mr. Purkey may challenge actions under the administrative remedy process, as explained in Section Three, Mr. Purkey attempted to use this system, but because of the prison's conduct, it was essentially unavailable to him. Further, an injunction will not provide redress for harms already suffered. Mr. Purkey has suffered from sleep deprivation and other symptoms since July 25, 2019. Additionally, other remedy systems, like the Federal Tort Claims Act ("FTCA"), do not provide adequate remedies. The Supreme Court explained the differences between a *Bivens* claim and the FTCA in detail in *Carlson* where the Court found that "the *Bivens* remedy is more effective than the FTCA remedy" and that "Congress did not intend to limit respondent to an FTCA action." *Carlson*, 446 U.S. at 20-21.

Lastly, while Defendants raise concerns over the time and defense costs imposed on officers and employees in a *Bivens* cause of action, there are suitable protections to remedy this issue. First, there is protection in the form of pleading standards: a complaint must state a claim that is "plausible." *Iqbal*, 556 U.S. at 679. Second, this Court screens all prisoner cases even before service, as it did her. Third, qualified immunity exists to protect potential actors from liability. Finally, "where such a claim is filed, courts can, and should, tailor discovery orders so that they do not unnecessarily or improperly

10

interfere with the officials work." *Abassi*, 137 S. Ct. at 1878 (Breyer, J., dissenting). Thus, there is sufficient protection under a *Bivens* remedy so that it would not burden government operations. Furthermore, unlike *Abassi*, Mr. Purkey is not "challeng[ing] large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners." *Id.* at 1862. This action concerns the conditions of confinement of Mr. Purkey.

The purpose of a *Bivens* claim is to "deter individual federal officers from committing constitutional violations." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001); *see also Carlson*, U.S. at 14. The purpose of a *Bivens* claim is met in this case, and Mr. Purkey has no other adequate relief that will provide the same deterring affect. Therefore, there are no special factors counselling hesitation from recognizing a new *Bivens* context in this case.

## C.    Qualified Immunity

### 1.    Qualified Immunity Is An Affirmative Defense That Should Not Justify Dismissal On A 12(b)(6) Motion.

In *Harlow v. Fitzgerald*, the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818 (1982). Qualified immunity provides "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Immunity is "assessed in light of the legal rules that were 'clearly established' at the time [the action] was taken," *Anderson v. Creighton,* 483 U.S. 635, 639 (1987). Thus, if it is clear to a "reasonable officer" that alleged conduct "was unlawful in the situation he confronted," defendant is not entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 202 (2001). However, "if a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Abbasi*, 137 S. Ct. at 1867. Significantly, it is not necessary that "the very action in question

11

has previously been held unlawful." *Anderson*, 483 U.S. at 640.  Thus, an officer may lose qualified immunity even when there is no reported case "directly on point." *Iqbal*, 556 U.S. at 741.

While the Seventh Circuit has noted a need to rule on qualified immunity at the earliest possible stage, qualified immunity is an affirmative defense, which is generally not appropriate for dismissal on the pleadings.  *See Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003) ("[a]ffirmative defenses do not justify dismissal under Rule 12(b)(6).";  *see also Landstrom v. Illinois Dep't of Children & Family Servs.*, 892 F.2d 670, 675 (7th Cir. 1990) ("As Judge Shadur noted, the context of the qualified immunity determination in this case is somewhat unusual; qualified immunity, as an affirmative defense, ordinarily leads to summary judgment under Fed.R.Civ.P. 56, not dismissal under Fed.R.Civ.P. 12(b)(6).");  *John K. Maciver Inst. for Pub. Policy, Inc. v. Schmitz*, 885 F.3d 1004, 1014 (7th Cir. 2018).  *But see Ewell v. Toney*, 853 F.3d 911 (7th Cir. 2017).

In *Ramsey*, this Court found that the plaintiff did not pled any facts that would "allow for the conclusion that any seizure was unreasonable," and granted defendant's motion to dismiss.  *Ramsey v. Glaser*, No. 1:18-cv-01543-JMS-TAB, 2018 WL 4846299, at *7 (S.D. Ind. Oct. 5, 2018).  However, unlike *Ramsey*, Mr. Purkey has pled sufficient facts to support a claim that Defendants' conduct was unreasonable.  Mr. Purkey did not "plead [himself] out of court by admitting all the ingredients of an impenetrable defense in the complaint, rendering a decision on the basis of qualified immunity appropriate." *Id* at *4.  Consequently, the case should not be dismissed on the pleadings.

> **2.    Defendants Violated A Constitutional Right That Was Clearly Established At The Time Of The Violation And It Would Have Been Clear To A Reasonable Actor That The Conduct Was Unlawful.**

To defeat the qualified immunity defense, a plaintiff must show: (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time so that it would have been clear to a reasonable actor that her conduct was unlawful in the situation. *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017).

First, there was a clear constitutional right violated: "[t]here is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional." *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) (quoting *LeMaire v. Maass*, 745 F. Supp. 623, 636 (D. Or. 1990), *vacated on other grounds*, 12 F.3d 144, 1458-59 (9th Cir. 1993)); *see also Grenning v. Miller-Stout*, 739 F.3d 1235, 1238 (9th Cir. 2014).

Second, it would have been clear to a reasonable actor that the conduct was unlawful in the situation. While there was a policy requiring guards to check on inmates to see if they were alive and breathing, Mr. Purkey voiced concerns about the lack of ability to sleep and detrimental effects the policy had on him. [Filing No. 2 at ¶ 29.] Further, he was forced to hit the emergency button in his cell after experiencing acute chest pains, shortness of breath, and extreme headaches. [Filing No. 24-6 (Epplin Decl. Attachment 5) at 3.] Mr. Purkey was forced to leave his light on during the night to prevent disruption by the guards, which still did not prevent the disturbances. [Filing No. 2 at ¶¶ 29-30.] A reasonable actor would have realized this conduct was unlawful, especially considering the actions taken by Mr. Purkey to allow the officers to check on him and not wake him up. At the very least, there is not enough information present to dismiss the action at this stage of litigation. A motion to dismiss is to "test the sufficiency of the complaint, not to decide the merits." *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989), *abrogated by Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668 (1996).

Consequently, Mr. Purkey has pled sufficient facts to support a claim that Defendants' conduct was unreasonable, especially considering the facts in the complaint in the light most favorable to Mr. Purkey.

13

### D.    Exhaustion

#### 1.    Rule 56(c) Legal Standard

Under Federal Rule of Civil Procedure 56(c) summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Therefore, in order to prevail on a motion for summary judgment, the moving party must demonstrate the absence of a genuine issue of material fact.  *Adickies v. S. H. Kress & Co.*, 398 U.S. 144, 153 (1970). Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

#### 2.    Statement of Material Facts in Dispute

Pursuant to Local Rule 56-1, Plaintiff does not dispute the evidence and material facts set forth in Defendants opening brief, but differs with the interpretation of that evidence, which must of course be taken favorably for the non-movant Plaintiff.    Further, Plaintiff re-asserts the additional material fact – referenced by Defendants at page 1 of their Brief [ECF25, p. 1] but not in their Statement of Material Facts Not in Dispute – that Plaintiff was at the time of filing this lawsuit scheduled to be executed December 13, 2019.

#### 3.    Administrative Remedies Were Unavailable To Mr. Purkey Because Of The Prison's Intimating Behavior, Long Response Times, and Complex Procedures.

In *Porter v. Nussle*, the Supreme Court held that the Prison Reform Litigation Act's exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  534 U.S. 516, 532 (2002).  Courts require "proper exhaustion" which means that the requirement is not fulfilled when grievances are dismissed because prisoners missed deadlines set by the grievance policy.  *See*

14

*Woodford v. Ngo*, 548 U.S. 81, 93-95 (2006). "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022 (7th Cir. 2002). Therefore, the prisoner must comply with the BOP administrative remedy system in 28 C.F.R. § 542 and BOP Program Statement 1330.18.

The purpose of the exhaustion requirement is "to reduce the quantity and improve the quality of prisoner suits." *Porter*, 534 U.S. at 524. Accordingly, "[The PLRA] gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors." *Woodford*, 548 U.S. at 94.

There is no "special circumstances" exception to the PLRA's exhaustion requirement. *See Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016). However, although there is no special circumstances exception, the Supreme Court in *Ross v. Blake* stated "[t]he only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" *Id.* The *Ross* Court described three circumstances where an administrative remedy was officially "on the books," but is not capable of use to obtain relief. *Id.* at 1859. First, "when (despite what regulations or guidance materials may promise) [the administrative procedure] operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* In this situation the remedy is "unknowable" so that "no ordinary prisoner can make sense of what it demands." *Id.* Lastly, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. Moreover, while the Supreme Court in *Ross v. Blake* cited three examples of situations where administrative remedies are unavailable, "these were only examples, not a closed list . . . ." *Ramirez v. Young*, 906 F.3d 530, 538 (7th Cir. 2018).

15

In this situation, a combination of factors make administrative remedies unavailable to Mr. Purkey.    First, the administrative process regarding required action when an inmate receives no response was so opaque it was incapable of use and no ordinary prisoner could make sense of it. Second, Mr. Purkey was frequently harassed and intimidated with regard to administrative actions. Third, Mr. Purkey was scheduled to be executed on December 13, 2019, rendering his administrative options unavailable.

> **4.**    **Long Response Times Made The Remedy Unknowable And No Ordinary Prisoner Could Make Sense Of What The Process Demands.**

No ordinary prisoner could make sense of the administrative process when an inmate does not receive a response.  28 C.F.R. § 542.18 provides that "[I]f the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level."  Mr. Purkey filed remedy number 987526-F1 on August 14, 2019.  [Filing No. 24-1 (Epplin Decl.) at ¶ 13.]  Mr. Purkey received a response on November 18, 2019, which explained that "this matter will be thoroughly reviewed and if it is determined staff acted inappropriately, this issue will be forwarded to the proper investigate authority.  However, you will not receive information regarding the outcome of any staff investigation."  [Filing No. 24-6 (Epplin Decl. Attachment 5) at 4.]  This response was ninety-six days after the initial filing.  The regulations state that the response time at the B-9 level is 20 days.[2]  Then, Mr. Purkey filed 991828-F1 on September 18, 2019.  [Filing No. 24-1 (Epplin Decl.) at ¶ 14.]  However, it was rejected as repetitive on September 24, 2019.  [*Id.*]  This message would lead a reasonable prisoner to conclude that the initial action was still pending.  Mr. Purkey did appeal the response to the Regional Office on October

---

[2] Unless there is an extension.  If there is an extension, the staff shall inform the inmate of the extension in writing. 28 C.F.R. § 542.18 (2020).

10, 2019. [*Id.*] While the response was dated December 30, 2019, Mr. Purkey received the response from the Regional Office on January 31, 2020—113 days later.

In a Third Circuit case, the court held that an inmate "was induced, led to believe, based on this policy statement [in DC–ADM 804] *as well as by security*, that [he] was required to first wait for their completion of the investigation and that [he] could then pursue a grievance in the event [he] was not satisfied with their findings or conclusion of the investigation." *Brown v. Croak*, 312 F.3d 109, 112 (3d Cir. 2002). Here, Mr. Purkey was also induced by the long response times and notice that his claim was repetitive. Further, in *Does 8-10 v. Synder*, the court found that:

> The point is, if an inmate receives no response, he or she must nonetheless submit an appeal within ten days after the date that a response was due—but the inmate really has no idea when the sixty-day clock begins to run for MDOC, and consequently, the date an appeal must be filed is unclear.

945 F.3d 951, 964–65 (6th Cir. 2019).

Similarly, the late response times and time between the Institution, Regional Office, and Central Office issuing a response and the time an inmate receives the response renders the process unknowable. For example, consider administrative remedy 998039-F1. The Regional Office responded to Mr. Purkey's appeal on January 30, 2020. However, Mr. Purkey did not receive this response until March 3, 2020. Mr. Purkey then appealed the decision to the Central Office on March 9, 2020. This appeal was received by the Central Office on March 16, 2020. However, the Central Office responded on March 31, 2020, but Mr. Purkey did not receive a response until June 3, 2020—seventy-nine days later. The response time at the Central Office level is forty days.[3] The time between appealing, the office responding, and actually receiving the response makes the process confusing to

---

[3] *See* 28 C.F.R. § 542.18 (2020).

17

a reasonable prisoner and unworkable.  Mr. Purkey dealt with a late responses on most of the grievances he filed.

The Seventh Circuit, like the Eighth and Fifth Circuits, has determined that administrative remedies are exhausted when prison officials fail to respond to grievances because those remedies are unavailable.  In *Lewis v. Washington*, the court stated "we refuse to interpret the PLRA so narrowly as to . . . permit [prison officials] to exploit the exhaustion requirement through indefinite delay in responding to grievances."  300 F.3d 829, 833 (7th Cir. 2007) (citations and quotation marks omitted).  Mr. Purkey admirably tried to comply with the grievance procedures despite the lack of responses.  It is important to remember that "the purpose of the PLRA's exhaustion requirement was to assure that available internal remedies would be utilized, not that judicial remedies would be foreclosed."  *Goodman v. Carter*, No. 2000 C 948, 2001 WL 755137, at *3 (N.D. Ill. July, 2 2001).

### 5.    Mr. Purkey Was Subject To Intimidation.

Second, Mr. Purkey was subjected to constant harassment when he filed administrate grievances.  For example, Mr. Purkey stated that on August 21, 2019 a SCU staff member told him that "you cause your own problems on this unit with all of the b.s. filings taht [sic] you do, causing everyone problems, and then you cry like a baby about the repercussions you suffer because of such." [Filing No. 2 at ¶ 12.]  Further, when Mr. Purkey complained about the constant fifteen-minute checks; C.O. Pruitt told him that "if you write that up then I'll write your ass up for lying." [Filing No. 24-17 (Epplin Decl. Attachment 16) at 2.]  The officers would not even give Mr. Purkey the name of the officer who was waking him up, making it difficult to file a proper grievance. [Filing No. 24-6 (Epplin Decl. Attachment 5) at 1-3.]  The above actions by officers of the prison demonstrate attempted intimidation to prevent Mr. Purkey from filing grievances.

**6.      Mr. Purkey's Execution Date Made The Administrate Remedy Process Unavailable.**

Lastly, Mr. Purkey was scheduled to be executed on December 13, 2019.  He filed suit on October 28, 2019.  Mr. Purkey complied with the law and tried to exhaust his remedies until he realized that his only option was to file suit because of the long response times, rendering his administrative options unavailable.

In sum, the intimidation and lack of responses in a timely manner made the administrate relief process unavailable to Mr. Purkey.  Moreover, the purpose of the PLRA to give "prisoners an effective incentive to make full use of the prison grievance process and accordingly provide[] prisons with a fair opportunity to correct their own errors," was not met in this situation.  *Woodford*, 548 U.S. at 94.  Long response times, confusing policies, and intimidation when an inmate files an administrative remedy does not provide inmates an effective incentive to make full use of the remedy system and demonstrates that the prison does not intend to correct their own errors.  Therefore, there is a genuine issue of material fact as to whether Mr. Purkey exhausted his remedies.

## III.      CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss and motion for summary judgment.

Respectfully submitted,

*/s/ John R. Maley*
John R. Maley
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana  46204
Telephone:      (317) 236-1313
Facsimile:      (317) 231-7433
Email:          jmaley@btlaw.com

*Court-Appointed Counsel for Plaintiff*

19